# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 12, 2010 Session

## JOHN GALLON, ET AL. v. HARRY ELBERSON, ET AL.

**Appeal from the Circuit Court for Sumner County**
**No. 29171-C      C. L. Rogers, Judge**

**No. M2009-01667-COA-R3-CV - Filed November 30, 2010**

The plaintiff home buyers filed suit against two home inspectors and a home inspection company after discovering defects in the home that were not mentioned in the inspection report. The court found that the defendants were negligent and granted the plaintiffs a judgment for damages against the home inspectors and the inspection company, individually, jointly and severally. The defendants argue on appeal that the judgment was not supported by the evidence and that in holding them individually liable, the court pierced the corporate veil without the proof of the extraordinary circumstances normally required for a court to do so. We affirm the finding of liability and the judgment for damages, but we vacate the judgment as to one of the individual defendants, because the evidence preponderated against the trial court's finding that he was in partnership with the other individual defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part, Vacated in Part**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Timothy T. Ishii, Nashville, Tennessee, for the appellants, Advantage Home Inspection and Environmental Services, Inc., David Vaudrey, and Cameron Stokes.

Louis White Oliver, III, Hendersonville, Tennessee, for the appellees, John Gallon and Wife, Sophia Gallon.

## OPINION

### I. A HOME INSPECTION AND SALE

John and Sophia Gallon ("the buyers") were retired residents of California who decided to move to Middle Tennessee. They retained a Tennessee real estate agent who located a number of homes for them to look at. Among them were a lakefront home at 181 Lake Valley Road in Hendersonville, owned by defendants Harry and Winnifred Elberson ("the sellers"). The Gallons came to Tennessee, briefly looked at several of the available homes, and returned to California. In August of 2005, the Gallons entered into a contract to purchase the Elbersons' home for $575,000.

The sellers furnished the buyers with a Tennessee Residential Property Condition Disclosure form. The disclosure form asked the sellers if they were aware of any "defects/malfunctions" in a list of various areas of the house, and the sellers only checked the box for windows. In the space for the explanation of such answers, they wrote in "some windows." An amendment to the contract of sale recited "seller to pay $2,000 towards buyers prepaids and closing cost in lieu of window repair."

In order to have a home inspection performed prior to closing, the buyers contacted several home inspectors and ultimately retained defendants David Vaudrey and Cameron Stokes ("the inspectors") to do the job.[1] Mr. Vaudrey inspected the home on August 25, 2006, and mailed a report to the buyers shortly thereafter. Among its other observations, the report listed broken sills and rotted trim on two or three of the home's windows. The report also stated that the rock foundation under the home's bay window "had been previously repaired in a professional manner." Mr. Vaudrey billed the buyers $421 for the inspection. His fee was promptly paid.

The closing on the sale of the home took place on or about October 14, 2005. The buyers moved into the residence about a week later. They discovered defects shortly thereafter which were not cited in either the owners' disclosure or the home inspector's report. These included a leaking roof, damaged ceiling drywall, non-functioning electrical outlets, and exterior doors that could only be opened with difficulty. There were also problems with the air conditioning system, the garage door openers, a garbage disposal unit, and the intercom system. The buyers met with Mr. Stokes in hopes of getting him to agree to repair the unreported defects, but the parties did not reach any kind of resolution. The buyers then repaired some of the defects as their own expense.

---

[1]The Gallons and the home inspectors reached agreement over the phone. They did not enter into a signed contract.

## II. Court Proceedings

On October 12, 2006, John and Sophia Gallon filed a complaint in the Circuit Court of Sumner County, naming Harry and Winnifred Elberson as defendants, as well as David Vaudrey and Cameron Stokes, "[i]ndividually and doing business as Advantage Home Inspection a/k/a Advantage Home Inspection and Environmental Services, Inc." The complaint listed eleven distinct defects that the plaintiffs alleged should have been disclosed by the sellers and/or discovered by the inspectors, and asked the court for an award of damages to repair those defects. The buyers' theories of recovery included negligent breach of the applicable standard of care for home inspectors in Middle Tennessee and fraud or negligent misrepresentation by the sellers and by the inspectors.

The sellers answered the complaint on November 16, 2006. Since they have not appealed the judgment of the trial court, we need not give much attention to those parts of the record that only affect their interests. The inspectors filed a joint answer on February 16, 2007. They denied that their inspection was negligent, and they asserted that in any case Mr. Vaudrey and Mr. Stokes were not individually liable because their "only involvement in the matters at issue in this litigation was as agents/employees of Advantage Home Inspection."

The trial was conducted on July 1, 2009. The buyers, the sellers and the inspectors all took the stand, as did other licensed home inspectors and contractors. The plaintiffs began their case by calling John Gallon, who testified among other things that he noticed on the first day he moved into the house that the doorknob on the front door was stuck and could not be turned, that the door could not be fully opened, that a set of French doors on the second floor could not be opened and that some of the windows were defective and that others were stuck shut. He testified that 11 out of the 21 windows in the house were defective, and that he replaced all of the windows at a cost of about $15,000.

Sophia Gallon testified that the buyers replaced all the wooden windows with vinyl because she wanted all of the windows to match, and that the house would have lost value if she only replaced the defective windows. She also testified that soon after moving in she noticed that the drywall in the cathedral ceiling of the entranceway had been patched. According to her testimony, she asked two individuals to come to the house in November or December of 2005 to look at the drywall, and she discovered at that time that there was a crack in the roof. She also testified that Mr. Stokes told her that he was Mr. Vaudrey's partner.

Michael Roy, a roofing contractor, testified that he looked at the roof in March of 2006, and that he saw a major crack in the shingles on the front of the roof, through which he could see the roof decking, and that "a home inspection certainly could see that." He also

observed vertically cracked shingles on the back side of the roof. Mr. Roy testified that it would cost $7,995 to replace the roof.

The buyers hired William Krause, a registered engineer and home inspector, to do an independent inspection of the house, which he conducted on April 14, 2006. He testified as to a number of defects that should have been reported in accordance with the detailed Standards of Practice of the National Association of Certified Home Inspectors ("NACHI"). Among other things, Mr. Krause observed that there was a gap between the dining room bay window and the stone foundation that supported and surrounded that window. He ascribed the gap to settling of the foundation, and he concluded that someone had attempted to repair a gap below the window by filling it in with mortar, because he observed that there were different colors of mortar in the mortar joints below the windows. He further testified that the only way to properly fix the problem would be to stabilize the foundation, and that the inadequate attempt at repair should have been readily observable and reported by a home inspector. As we noted above, Mr. Vaudrey had reported that someone repaired the foundation in a professional manner.

Mr. Krause used binoculars to examine the roof from the ground, and he observed a crack in the roof that he testified should also have been reported. He also observed water stains in the ceiling drywall below the same general area where the crack in the roof was located. Additionally, he examined the electrical outlets in the house, found several that were non-functioning or were not properly grounded, and marked them with red dots so an electrician could identify them for repair. Mr. Vaudrey's inspection report had stated that "all accessible electrical fixtures, switches and outlets throughout the house were tested," but did not mention any problems with the electrical system.

The next witness to be called was Tom Sherry, who identified himself as a licensed general contractor since 1971 and a licensed home inspector. He testified that he came to the house at 181 Lake Valley Drive, looked at the repairs that had been made, and reviewed the invoices and estimates for those repairs. Among other things, he stated that the $2,300 price charged by a contractor to Tennessee to repair the foundation under the bay window was a fair and reasonable price in Middle Tennessee, that $3,100 was a fair and reasonable price for replacing, finishing and painting the sheet rock in the ceiling, and that $14,491 was a fair and reasonable price for replacing all the windows in the house. He acknowledged that $6,428 could be deducted from the $14,491 cost of replacing all the windows to account for those that did not need replacement.

When Harry Elberson was called to the stand, he testified that he repaired the damaged ceiling drywall while living in the house, and he acknowledged that he did not mention the repair in the disclosure form. He stated that the drywall was not wet, but that

-4-

it just needed some cosmetic repair. He conceded that he did not disclose the defects that he repaired, including using putty to fill in the gap between the settling bay window foundation and the window itself, and repairing the foundation by patching it, because he believed that his repair were adequate. He admitted that the front door was hard to open, but he stated that he did not consider that to be a defect.

Randy Stokes testified that he worked about five hours a week for Advantage Home Inspection and was paid a salary, but that Mr. Vaudrey was often unable to pay him. He also testified that he had his own computer business. He denied that he was in a partnership with Mr. Vaudrey or played any role in Advantage Home Repair other than as Mr. Vaudrey's part-time employee and friend. He admitted that he may have referred to himself as Mr. Vaudrey's partner or as his "partner in crime," but he said they were just buddies, and that calling him a partner was just "a Southern thing."

David Vaudrey testified that he was a licensed home inspector and that he followed the applicable professional standards for such inspections set out by the National Association of Certified Home Inspectors.[2] He stated that he conducted the disputed inspection by himself, without any assistance. He testified that he climbed up on the roof, but that there definitely was no crack there, and he suggested that it must have appeared after his inspection. He admitted that he noticed places that were patched with tar, but declared that such patches were "not uncommon." He also stated that he checked the outlets and the windows that he could get to, but that because the sellers' furniture was still in the house when he did the inspection, he could not reach some of the windows or outlets for inspection. "If I would have had to touch any furniture, then I would not have checked it."[3] He also said that he checked the foundation, but did not see any problems.[4]

---

[2] The transcript actually quotes Mr. Vaudrey as stating that he followed the standards of the Nashville Association of Certified Home Inspectors. This appears to be one of many obvious errors made in the process of transcribing the proceedings.

[3] Tennessee Code Annotated § 62-6-302(4)(B) provides that a home inspection report shall include "[a] list of any systems or components that were designated for inspection in the standards of practice adopted by the commissioner but that were not inspected." Tennessee Code Annotated § 62-6-302(4)(C) requires the inclusion of "the reason a system or component listed under subdivision 4(B) was not inspected."

[4] Parts of David Vaudrey's deposition testimony were read into the record, including testimony that he did not inspect the rock foundation of the bay window.

At the conclusion of the proof, the trial court announced its decision from the bench, which was memorialized in a Final Order filed on July 17, 2009. The court found that Mr. Vaudrey had conducted a "lax and defective" home inspection, preventing the buyers from making a properly informed decision about the purchase of the house. The court also found that Mr. Vaudrey and Mr. Stokes were partners and that the existence of their partnership was made known to the buyers. Turning to the sellers, the court found that they had failed to disclose the defective electrical outlets and a non-functioning garbage disposal unit.

The court accordingly granted the buyers a judgment against the sellers and inspectors, jointly and severally, in the amount of $265 for the electrical outlets and $294 for the defective garbage disposal. The largest portion of the court's award was, however, assessed against the inspectors alone. The court found Mr. Vaudrey and Mr. Stokes to be liable, "individually, severally, and doing business as Advantage Home Inspections," for damages in the total amount of $19,504, based on the enumerated repair costs for the foundation of the bay window, the windows that had to be replaced, the roof, and the French doors on the second floor. The court also found that the buyers had failed to mitigate their damages in regard to the drywall, front door and lock, intercom and garage door openers, and declined to award them damages for those items. This appeal followed.

### III. ANALYSIS

#### A. The Standard of Review

Since this is a non-jury case, our review on appeal of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). We review a trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).[5]

---

[5]Although not specifically characterized as such in the complaint, the central claim in this case bears all the hallmarks of a claim for professional malpractice. The plaintiffs state that the defendants "had the duty to perform home inspections in a manner consistent with the standard of care for home inspectors throughout the Middle Tennessee area," and they claim that the defendants breached that standard of care. The standards of the NACHI were introduced into the record, and a licensed home inspector was called as an expert witness to testify both as to that standard and as to its breach. Perhaps the plaintiffs did not label their complaint as one for professional malpractice because the Tennessee Home Inspector License Act of 2005, the most recent iteration of the licensing requirements for licensing of home inspectors, did not take effect until July 1, 2006, eleven months after the inspection under dispute was conducted.

**B. The Sufficiency of the Proof**

The inspectors argue on appeal that the proof was insufficient to support an award of damages against them. They base their argument on the standards of the NACHI, which were placed into evidence by the buyers, and on the Tennessee Home Inspector License Act of 2005, which largely incorporates those standards. In particular, they point to Tenn. Code Ann. § 62-6-302(3)(A), which defines a home inspection as a "visual analysis for the purpose of providing a professional opinion of the condition of the residential building . . ." as the basis for their argument that a home inspector should not be required to report anything that is not "visually apparent."

They also cite Tenn. Code Ann. § 62-6-302(3)(B), which states that "home inspection"does not mean "a compliance inspection for building codes," and that it "does not mean any work that is within the scope of practice of architecture, engineering or landscape architecture . . . " Their argument is that since home inspections are not engineering tests, they are limited to visual and non-invasive inspections of the premises on the date of inspection. They conclude that since Mr. Vaudrey testified that he visually inspected the foundation and roof in a non-invasive manner, he could not have been negligent and that he therefore met the standard of care.

These arguments are belied by the fact that Tenn. Code Ann. § 62-6-302(3)(A) calls for a professional opinion, and that other portions of the statute indicate that a proper home inspection requires a level of expertise far beyond what is implied by the inspectors' argument, including knowledge about heating, cooling, electrical and plumbing systems, and about structural components of the house such as foundations and roof coverings. Further, under the Tennessee Home Inspector License Act of 2005, an applicant for a home inspection license must compete a ninety hour program or course of study before licensure, Tenn. Code Ann. § 62-6-305(5), and must also pass a competency examination, Tenn. Code Ann. § 62-6-305(6). As we noted above, buyers' expert witness William Krause testified that he found defects in the roof and in the foundation that should have been observed and reported by a licensed home inspector in accordance with the Standards of Practice of the NACHI.

The inspectors argue, however, that since Mr. Krause performed his inspection eight months after they did theirs, his testimony as to those defects "is not conclusive proof that the defects existed at the time of Appellants' inspection or that the inspection was negligent." The trial court is not bound to consider only proof that is conclusive in and of itself. Its role is to determine where the preponderance of that evidence lies by weighing all the relevant evidence . See *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997); *Realty Shop v. RR Westminster Holdings*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999); *Cole v. Clifton*, 833

-7-

S.W.2d 75, 77 (Tenn. Ct. App. 1992).

The interval between the inspections goes to the weight of the evidence presented, but does not totally negate the probative value of the later inspection. To hold otherwise would make virtually any claim based on evidence gathered on the ground after the event giving rise to the claim impossible to prove. In sum, the evidence does not preponderate against the trial court's finding that the home inspection performed by Mr. Vaudrey was negligently done.

### C. The Measure of Damages

The trial court based its award of damages on the cost of repairing the defects that Mr. Vaudrey overlooked, but which a competent inspection would have revealed. The inspectors point out that there are no Tennessee cases defining the proper measure of damages for a negligent home inspection. They acknowledge that the cost of repair is the proper measure of damages in cases involving faulty home construction. *See GSB Contractors v. Hess*, 179 S.W.3d 535, 539 (Tenn. Ct. App. 2005).[6] They suggest, however, that such a standard may be excessively harsh in home inspection cases, because unlike a contractor, a home inspector is not in control of the facts giving rise to the lawsuit. As the inspectors wrote,"[h]ome inspections, as opposed to contractors, or even invasive engineering studies do not, and cannot, control the essence of the controversy, *i.e.,* the elemental condition of the home."

While this may be a valid point, any lesser measure of damages would not be sufficient to make an injured plaintiff whole. "The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed." *GSB Contractors v. Hess*, 179 S.W.3d at 541 (citing *Wilhite v. Brownsville Concrete Co.,* 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990)). Where a home buyer has relied on the professional expertise of a licensed home inspector to purchase a home, and as a result has had to bear the expense of repairing a defect that the home inspector should have discovered, then the buyer must recover the cost of that repair in order to be made whole.

---

[6]In *GSB Contractors v. Hess*, the court actually held that the measure of damages for defective performance of a residential construction contract will be the cost of repair unless repair is not feasible or the cost of repair is disproportionate to the reduction in the value of the structure caused by the defective construction. In the event that the cost of repairing the defect is disproportionately greater than the reduction in the value of the structure, then the reduction in value may be used instead as the measure of damages. *GSB Contractors v. Hess*, 179 S.W.3d at 543 (citing *Redbud Cooperative Corporation v. Clayton*, 700 S.W.2d 551 (Tenn. Ct. App.1985)). In this case, there was no proof presented of any reduction in the value of the house from the undisclosed defects. In our discussion of the measure of damages in this case, we will therefore only discuss the appropriateness of applying the cost of repair.

The inspectors argue that applying the same measure of damages to a faulty home inspection as to a faulty construction job puts the whole profession of home inspection at risk, because it can lead to virtually unlimited liability for a home inspector. We note, however, that in drafting the Tennessee Home Inspector License Act of 2005, our legislature apparently anticipated such a possibility and that it has taken steps to mitigate the risk. Tenn. Code Ann. § 62-6-305(7) requires a licensed home inspector to obtain "a certificate of insurance in an amount required by the commissioner for general liability as well as errors and omissions to cover all activities contemplated under this part." Under the current rules, that amount is $500,000. Tenn. R. & Regs. 0780-5-12-.04(2)(g). We further note that a home inspector may not be held liable for the cost of repairing defects that he discovers and reports in the exercise of his professional expertise. Thus, using the costs of repair as the measure of damages for a faulty home inspection is reasonable.

## D. The Apportionment of Liability

The trial court found that Mr. Vaudrey and Mr. Stokes were partners in Advantage Home Inspection, and it accordingly imposed joint and several liability upon the two men, as well as upon the company. We have found very little evidence in the record, however, to support a finding of partnership. Ms. Gallon testified that Mr. Vaudrey told her that he was a partner with Mr. Stokes, and Mr. Stokes may have used that term after he met the buyers. Mr. Stokes stated, however, that he worked for Mr Vaudrey, but denied that he was in a partnership with him. He testified that Mr. Vaudrey was his buddy rather than his business partner. Mr. Stokes also testified that he owned his own computer business, that he generally only worked about five hours a week for Mr. Vaudrey, and that sometimes there was not enough money to pay him.

While Mr. Vaudrey apparently asked Mr. Stokes to talk to the buyers about the defects they discovered and to try to reach some kind of resolution with them, it is undisputed that Mr. Vaudrey conducted the faulty home inspection by himself. There was no proof that Mr. Stokes was licensed as a home inspector or that he was in any way responsible for the quality of the inspection performed by Mr. Vaudrey. It appears to us that the evidence preponderates against the trial court's finding that Mr. Vaudrey and Mr. Stokes were partners, and there is thus no basis for holding Mr. Stokes jointly liable to the buyers with Mr. Vaudrey. There is also no other evidence to form a basis for apportioning any part of the damages to him.

The main thrust of the inspectors' argument lies elsewhere, however. They contend that they cannot be held personally liable for the faulty inspection, because at all times they were agents or employees of Advantage Home Inspection, which they allege on appeal to be a validly chartered corporation. They further argue that in holding them personally liable, the trial court "pierced the corporate veil," without proof of the elements required to take

such action. When we examine the record, however, we find very little in the way of argument or evidence to support their position.

As we noted above, there was no written contract between the parties, and thus no proof that the buyers knew, or should have known, that they were entering into a contract with a corporation rather than with the individual they spoke to on the phone. The inspectors also did not present any proof at trial that Advantage Home Inspection was a valid Tennessee Corporation and in good standing with the Secretary of State.

It could perhaps be argued that by filing suit against "David Vaudrey and Cameron Stokes, Individually and doing business as Advantage Home Inspection a/k/a Advantage Home Inspection and Environmental Services, Inc.," the buyers were tacitly acknowledging that Advantage Home Inspection was a validly chartered corporation. It appears to us, however, that since the heading of the invoice that was sent to the buyers reads "Advantage Home Inspection & Environmental Services, Inc.," the buyers were simply trying to make sure that they did not fail to identify any possible defendant who might be liable to them. In any case, they did not allege anything about the corporate status of Advantage Home Inspection in the body of their complaint.

The inspectors had the opportunity to allege the existence of a valid corporation in their Answer to the Complaint. However, they did not do so explicitly, by asserting that "[d]efendants Vaudrey and Stokes must be dismissed as there is no basis for the Plaintiffs to allege any individual theories of liability against those individuals whose only involvement in the matters at issue in this litigation was limited by actions taken by them as agents/employees of Advantage Home Inspection."

As the inspectors point out, the official transcript of the trial of July 1, 2009 is somewhat garbled. The inspectors' attorney is quoted as saying in his opening remarks that the individual defendants "have worked as agents to the corporation when it was in existence throughout the entire time of this transaction going back to 2003." Although it is not reflected in the transcript, the attorney asserts that the court reporter omitted his explicit statement that his clients could not be held individually liable unless the trial court pierced the corporate veil.

In any case, there was no testimony at trial about the existence of a valid corporation, piercing the corporate veil, or the question of individual immunity. The inspectors' attorney explains this omission by citing the following exchange between the court and the buyers' attorney prior to the opening of testimony:

The Court: Is your complaint alleging fraud or misrepresentation as to the home inspectors or is it just damages?

Mr. Oliver: No, I can't prove fraud, Your Honor. So I will strike the fraud claim.

The inspectors' attorney assumed that in the absence of a claim of fraud or misrepresentation, it would not be necessary for him to defend against the possibility that the trial court could pierce the corporate veil to hold the inspectors individually liable for negligently inspecting the Gallons' new home. Of course, in the absence of proof as to the existence of a valid corporation, there is no corporate veil that needs to be lifted. Also, while fraud and misrepresentation are factors the courts may consider when determining whether to disregard the corporate entity and hold individuals personally liable for actions taken in the name of the corporation, they are not the only possible factors. *See Oceanics Schools, Inc. v. Barbour,* 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003) (setting out eleven factors, some combination of which the courts typically rely upon in deciding such an issue).

At the conclusion of the proof, the attorneys for all the parties had the opportunity to give closing arguments. None of the attorneys referenced anything involving the corporate form of Advantage Home Inspection. Under the Rules of the Court of Appeals 6(a)(1) the appealing party is required to provide written argument in regard to each error asserted on appeal, as well as "a statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge to the alleged error is recorded." The inspectors' attorney admits that he did not point out to the trial court its purported error in apportioning liability as it did. He insists, however, that he had no opportunity to call the court's attention to its failure to consider the corporate immunity of Mr. Vaudrey and Mr. Stokes, because "this error was announced at the close of trial, without possibility of objection (other than a premature Tenn. R. Civ. P. 59 motion)."

Rule 59 gives a party the opportunity to bring errors to the attention of the trial court before a judgment becomes final. Thus, the inspectors could have filed a Rule 59 Motion to Alter or Amend the trial court's order or a Motion for New Trial within 30 days of its entry of the order. But no such motion was filed. Tenn. R. App. P. 36(a), which sets out the relief available from the Court of Appeals and the other appellate courts of this state declares that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably necessary to prevent or nullify the harmful effect of an error." In light of the total lack of evidence in the record to support the inspectors' argument as to lifting the corporate veil, and their attorney's failure to call the trial judge's purported error to his attention, we affirm the trial court's holding that David Vaudrey is personally liable for the negligent inspection he performed.

-11-

## IV.

The judgment of the trial court as to the liability of David Vaudrey and Advantage Home Inspection is affirmed. Its judgment as to the liability of Cameron Stokes is reversed. We remand this case to the Circuit Court of Sumner County for any further proceedings necessary. Tax the cost on appeal to appellants David Vaudrey and Advantage Home Inspection.

_____
PATRICIA J. COTTRELL, JUDGE